**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO. 26-211** |
| **ABDEL ADHAMI, ET AL.** | **SECTION: "P" (3)** |

# ORDER AND REASONS

Before the Court is the Government's Motion to Stay Defendants' Release and to Revoke the Magistrate's Release Order as to Defendants Abdel Adhami and Omar Adhami.[1] Omar opposes the Government's motion.[2] The Government has filed a reply.[3] This Court held a hearing on the Government's motion as to Defendant Omar Adhami on October 29, 2026,[4] and this Order and Reasons resolves the motion only as to Defendant Omar Adhami.

Because Omar and his co-defendant, Abdel Adhami, are brothers who share a surname, the Court refers to each by his first name, and to each man's wife by her first name. The Court treats Omar and Abdel separately. Because the brothers are charged together and much of the record addresses them jointly, this Order and Reasons describes Abdel's alleged conduct and his statements where needed for context and background. The Court does not attribute Abdel's conduct or statements to Omar except where the record ties them to him.

## I. INTRODUCTION

Omar Adhami, a United States citizen who has lived in this district for six years with his wife and children, is charged with his brother, Abdel Adhami, with providing material support to Hamas, a designated foreign terrorist organization, and with conspiring to provide that support, to

---

[1] R. Doc. 48.
[2] R. Doc. 68.
[3] R. Doc. 69.
[4] R. Doc. 72.

commit wire fraud, and to launder money.[5] The Government contends that, beginning in October 2023, the brothers sent money to Hamas through an association in France, using code words to make the transfers appear to be charitable donations.[6] Omar contends he believed his donations were feeding people in Gaza, not supporting Hamas.[7]

After a detention hearing held over two days, the Magistrate Judge called the question of whether to release or detain Omar a close one, and he ordered Omar released to the custody of his aunt on conditions that included location monitoring and the surrender of his passports.[8] The Government asks this Court to revoke that order, and the Court reviews the question de novo.[9] Because Omar is charged with an offense listed in 18 U.S.C. § 2332b(g)(5)(B), the law presumes that no condition of release will reasonably assure his appearance and the safety of the community, although the Government retains the burden of persuasion.[10]

The Court has weighed the evidence on both sides. Omar has substantial ties to this district and no criminal convictions, he proposed a dedicated custodian, and his family delivered his passports to his legal counsel.[11] After his arrest, however, while his accounts in this country were frozen, Omar arranged on recorded calls for a relative in Jordan to withdraw up to $30,000 from Omar's account there and hold it in the relative's own account, describing it as the only money he could hide.[12] He holds a Jordanian passport, and his wife owns an apartment in Amman.[13] At the hearing before this Court, the Government offered a confidential witness's account of a statement

---

[5] R. Doc. 9.
[6] R. Doc. 48-1 at 5 (citing R. Doc. 9); R. Doc. 74 at 39:19–40:5, 40:23–41:3.
[7] R. Doc. 68 at 6.
[8] R. Doc. 74 at 115:7–11, 118:11–119:19.
[9] *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985).
[10] 18 U.S.C. § 3142(e)(3)(C); *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989).
[11] R. Doc. 68 at 1–3; R. Doc. 74 at 60:2–12, 67:21–69:5, 100:17–101:1.
[12] R. Doc. 74 at 57:8–25; R. Doc. 48-2 at 2–3; R. Doc. 74 at 29:4–7, 30:19–21, 31:4–21.
[13] R. Doc. 74 at 59:22–60:12, 62:18–63:3; R. Doc. 68-2 at 2–3.

attributed to Abdel,[14] and the United States Pretrial Services Office withdrew its recommendation of release.[15] The Court gives the statement and the change in recommendation little weight as to Omar, and its decision as to Omar would be the same without them. Considering the record as a whole and the applicable law, including the statutory presumption, the Court finds by a preponderance of the evidence that no condition or combination of conditions will reasonably assure Omar's appearance as required. The Court therefore revokes the release order and orders Omar detained pending trial.

## II. BACKGROUND

### A. The Charges

On September 11, 2026, the Government filed a criminal complaint against Abdel.[16] Omar was charged in a separate complaint.[17] Six days later, a grand jury sitting in New Orleans returned a four-count indictment against Abdel and Omar.[18] Count One charges the brothers with providing material support or resources, namely money, to Hamas, an entity the Government alleges the Secretary of State has designated as a foreign terrorist organization since on or about October 31, 2001.[19] The indictment alleges that the brothers gave this financial support knowing that Hamas had been so designated, and knowing that Hamas has engaged, and was engaging, in terrorist activity and terrorism.[20] Count Two charges the brothers with conspiring to provide that support.[21] Count Three charges them with conspiring to commit wire fraud.[22] Count Four charges them with

---

[14] *See* R. Doc. 72-1.
[15] *See* R. Doc. 72 (referencing Amy LaPointe testifying). Because the transcript from the motion hearing is not presently available, the Court cites to the Minute Order from the October 29, 2026 motion hearing as the record citation for testimony presented during the motion hearing.
[16] R. Doc. 1, Case No. 26-mj-112.
[17] R. Doc. 1, Case No. 26-mj-111.
[18] R. Doc. 9.
[19] *Id.* at 1–2.
[20] *Id.* at 1–2; *see* 18 U.S.C. § 2339A(b)(1) (defining "material support or resources" to include "currency"); *id.* § 2339B(a)(1).
[21] R. Doc. 9 at 2–26; *see* 18 U.S.C. § 2339B(a)(1) (reaching whoever "attempts or conspires to do so").
[22] R. Doc. 9 at 26–31; *see* 18 U.S.C. §§ 2, 1343.

conspiring to launder money. It alleges that, as part of their conspiracy, they transferred and attempted to transfer more than $10,000 into and out of the United States, intending to promote their material-support and wire-fraud conspiracies charged in Counts Two and Three.[23]

The Government contends that, since October 2023, Abdel and Omar made at least 137 transfers totaling $103,438.34 to Hamas through an association in France.[24] It further contends that both brothers communicated directly with Saleem Alzaq, whom it describes as a known member of Hamas in Gaza, and that the brothers tried to hide their financial support by using code words meant to make the support appear to be charitable contributions for those in need.[25]

According to the Government, on October 7, 2023, Hamas fighters attacked civilians in southern Israel, killing more than 1,000 people and taking more than 200 hostages.[26] The Government contends a message Abdel sent to Omar on November 4, 2023, less than a month after the October 7, 2023 attack on Israel, shows the brothers knew exactly with whom they were communicating and where their money was going.[27] The message stated the following:

> Omar, listen! I was talking with that guy and I told him, one helps the children, and those in need, but what can one do for our brothers, those guys, the true men, do you understand me? And he told me not to worry, we are giving them as well. . . . If one sends $10 or $20 a day, because the prophet said, "He who equips a fighter is as if he has taken part in the fighting himself." . . . When you talk to him, do not say like that. He uses the word "bread". So, when you want to send something, you tell him, "This amount for the bread", and he will understand. Don't mention anything by its name on WhatsApp and use the word "bread" instead.[28]

---

[23] R. Doc. 9 at 31–32; *see* 18 U.S.C. §§ 2, 1956(f), (h).
[24] R. Doc. 48-1 at 5 (citing R. Doc. 9); R. Doc. 74 at 39:24–40:2. The Court notes that the Indictment charges that Abdel transferred $94,118.11 total, and Omar transferred $11,420.23 total, which, combined, equals $105,538.34. *See* R. Doc. 9 at 28–31.
[25] R. Doc. 48-1 at 5 (citing R. Doc. 9); *see* R. Doc. 74 at 30:4–9, 37:25–38:6, 39:22–40:2, 40:23–41:3.
[26] R. Doc. 48-1 at 5 (citing R. Doc. 9); R. Doc. 74 at 38:7–8.
[27] R. Doc. 48-1 at 5–6 (citing R. Doc. 9).
[28] R. Doc. 48-1 at 6 (citing R. Doc. 9).

Omar responds that the indictment attributes only about $11,000 of the more than $100,000 in transfers to him, that most of his transfers went to an organization in France rather than to individuals in Gaza, and that his alleged text messages with Saleem Alzaq are "limited to a few words and are completely innocuous."[29] If convicted of either material-support offense, Omar faces a maximum sentence of twenty years of imprisonment.[30] The wire-fraud and money-laundering conspiracy counts each carry a maximum of twenty years as well.[31]

### B. Proceedings Before the Magistrate Judge

#### 1. The Detention Hearing

The brothers were arrested on September 15, 2026.[32] Their initial appearance was set for September 16, 2026, but was continued because of language issues and held on September 18, 2026.[33] Both defendants were arraigned on September 21, 2026.[34] The Magistrate Judge held a joint detention hearing for the defendants on October 7 and October 14, 2026.[35] On October 7, Mr. David DeRoche, whom Abdel offered as his third-party custodian, testified.[36] And on October 14, FBI Language Specialist Safie Salama, FBI Agent David Crabtree, and Sara Mojahed, the brothers' aunt, whom Omar offered as his third-party custodian, testified.[37] In addition, the United States Probation Office prepared a Pretrial Services Report for each defendant that was provided to the Magistrate Judge prior to the detention hearing.

[29] R. Doc. 68 at 5–6 (citing R. Doc. 9 at 7–9, 30–31).
[30] 18 U.S.C. § 2339B(a)(1) (providing that whoever "knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so," may be "imprisoned not more than 20 years," or for any term of years or life if the death of any person results).
[31] *Id.* §§ 1343, 1349, 1956(a)(1)–(2), (h).
[32] R. Doc. 74 at 21:2–8.
[33] R. Doc. 48-1 at 2; R. Doc. 14 (Omar); R. Doc. 15 (Abdel); R. Doc. 74 at 21:2–16.
[34] R. Docs. 38, 39.
[35] R. Docs. 36, 37, 46, 47.
[36] R. Doc. 73 at 4:13–10:22.
[37] R. Doc. 74 at 4:22–5:3, 18:21–19:2, 67:7–23, 68:21–69:5.

### 2. Testimony Concerning Both Defendants

***The translations.*** FBI Language Specialist Safie Salama has been a language specialist for more than eighteen years. He served as a language specialist for the United States military for ten years, both on active duty and as a Defense Department contractor, before joining the FBI more than eight years ago.[38] His native language is Egyptian Arabic, and he is trained and certified in most Arabic dialects. He testified that the Egyptian dialect is close to the Palestinian dialect.[39] Salama was tasked with listening to the Adhami brothers' jail calls, without bias, and summarizing pertinent material, whether inculpatory or exculpatory.[40] He testified that FBI translations prepared for a court hearing go through a process called "operational review," in which a second certified language specialist checks the translation, and a third specialist is brought in if they are in doubt.[41] The call summaries offered at the Magistrate Judge's detention hearing, however, were summaries Salama typed while listening to each call, not verbatim translations, and he did not review the calls before testifying in front of the Magistrate Judge.[42]

Salama testified that Arabic is "so complicated," and he agreed when questioned by Abdel's counsel that a word that would be rendered in English as "hiding" can mean to "set-aside or save."[43] He also agreed that the word "jihad" does not necessarily mean to fight and can mean "struggle," explaining that "[w]e can call jihad against our sins, against our self, against enemies," and its meaning "depends on the context."[44] On redirect, Salama testified that the meaning of the word he translated as "hide" "depends on the context." He explained the calls spoke of hiding money in Jordan or Palestine for when the family relocates, to build a new business, to keep the

---

[38] *Id.* at 5:5–12.
[39] *Id.* at 5:13–25.
[40] *Id.* at 6:10–17.
[41] *Id.* at 6:17–7:4.
[42] *Id.* at 9:14–23, 11:7–12, 13:19–14:8.
[43] *Id.* at 14:9–24.
[44] *Id.* at 14:25–15:6.

money from being seized by the Government, or for the family to live, and that "[i]t meant all of these meanings."[45]

***The investigation and the charged conduct.*** FBI Agent David Crabtree of the FBI's Joint Terrorism Task Force in New Orleans testified that he was one of the case agents on the squad that investigated the Adhami brothers, but he was not the actual case agent. He reviewed telephone calls, summaries, and documents in connection with the investigation.[46] He identified Saleem Alzaq as the member of Hamas who received the brothers' money on its behalf, and he testified that Alzaq is a confirmed member of Hamas.[47] Agent Crabtree described some of the conduct charged in the indictment, including the transfer of money through PayPal to an association in France, which converted the donated funds into cryptocurrency and sent it to Alzaq in Gaza.[48]

***The conversation quoted in the indictment.*** In a conversation quoted in the indictment, Abdel, Omar, and their brother, Mohammad, discussed sending $1,000 to Gaza "for the bread," on or about February 29, 2024.[49] Agent Crabtree testified that "bread" or "bread people" was the code word the brothers used for Hamas throughout their conversations, and that this conversation made clear the brothers knew they were sending money to support Hamas.[50]

***Raed Yousef and the safe deposit boxes.*** Raed Yousef is identified in the indictment as a co-conspirator. He has been charged separately in the Middle District of Florida with providing material support to Hamas and has been detained pending trial in that case.[51] Agent Crabtree testified that Yousef is the brothers' business partner and Abdel's best friend.[52] According to the

[45] *Id.* at 17:3–22.
[46] *Id.* at 19:4–22.
[47] *Id.* at 30:4–9, 38:5–6, 41:7–9.
[48] *Id.* at 39:19–40:5.
[49] R. Doc. 9 at 16; R. Doc. 74 at 40:20–24.
[50] R. Doc. 74 at 40:24–41:6.
[51] R. Doc. 48-1 at 6 & n.1; R. Doc. 74 at 62:1–4 (identifying Raed Yousef as a co-conspirator named in the indictment).
[52] R. Doc. 74 at 65:4–9.

Government, on November 4, 2023, the same day Abdel sent his "bread" message to Omar, Abdel also recruited Yousef to send money to Hamas, telling him in an audio message, "Here we tell them, we say bread."[53] When Yousef's home in Tampa was searched, agents found a fictitious Jordanian passport bearing Yousef's picture and another person's name.[54] After his arrest, Omar asked on a recorded call about "Raed Yousef."[55] At the time of the hearing before the Magistrate Judge, the FBI believed each brother had a safe deposit box and had prepared draft seizure warrants, but had not examined them.[56] The Magistrate Judge noted that he did not take Agent Crabtree's testimony on this point "as being extremely firm" because Crabtree was not the case agent.[57]

### 3. Evidence Concerning Omar

***Omar's background.*** Omar is a United States citizen and was a part owner of two beauty supply stores in this district, now closed after the FBI searches and seizures.[58] Before his arrest, Omar lived in Covington, a suburb of New Orleans, with his wife, Amani, and their two young children. Amani is pregnant with the couple's third child. Omar has lived in this area for six years; his parents live nearby; he has no criminal convictions; and he was the primary source of income for his pregnant wife and young children.[59] Asked whether there are state charges against "the defendants," Agent Crabtree testified there are, for benefits fraud.[60]

***Travel and property abroad.*** Omar's most recent trip abroad ended on August 2, 2026, when he flew from Doha to Miami.[61] According to Omar's counsel, his telephone was seized when

---

[53] R. Doc. 48-1 at 6 (citing R. Doc. 9).
[54] R. Doc. 74 at 62:1–6.
[55] R. Doc. 48-2 at 3; *see also id.* at 1 (asking about "Ra'id").
[56] R. Doc. 74 at 65:12–24.
[57] *Id.* at 66:18–21.
[58] R. Doc. 68 at 1; R. Doc. 74 at 58:6–11.
[59] R. Doc. 68 at 1–2; R. Doc. 68-1; R. Doc. 74 at 57:14–17.
[60] R. Doc. 74 at 37:20–24; *see* R. Doc. 48-2 at 2.
[61] R. Doc. 74 at 34:20–35:2.

he left the country in June 2026 and was mailed back to him about fourteen days later. The Government stated it "also had access to Omar's phone," that the phone "was done by CBP," and it had not yet been analyzed.[62] On jail calls after his arrest, Omar and Amani discussed "Omar's house in Jordan" and "Omar's house in Palestine (in the West Bank)," specifically that the house in Jordan must not be sold.[63] A family friend named Osama referred on one call to "the house Omar purchased back in his country."[64] In addition, Omar has submitted Jordanian and Palestinian records, with translations, showing that he has no real property registered in his name in Jordan, and that no property is registered in his name in the property tax records of the Ramallah and Al-Bireh Property Tax Department of the Palestinian Ministry of Finance. The Court notes, however, that the Palestinian certificate reflects only that particular department's records.[65] Amani, a Jordanian citizen, owns a 147-square-meter apartment in North Amman, registered to her by a deed dated June 15, 2026.[66]

***Passports.*** On September 18, 2026, Omar asked Amani on a recorded call to have all their passports ready and to hide them somewhere safe, but he then told her to disregard this instruction because the FBI was listening to his calls. He then asked Amani to find a trustworthy friend to keep "all these valuables."[67] In another call, Omar explained to Amani that, because he was born in the United States, he would not be able to leave this country on his Jordanian passport.[68]

Omar's family delivered his United States and Jordanian passports to counsel at the federal courthouse in New Orleans on October 7, 2026, so they could be surrendered, and counsel had

---

[62] *Id.* at 111:21–24 (statement of Omar's counsel); *id.* at 102:8–15 (statement of the Government); R. Doc. 68 at 7.
[63] R. Doc. 48-2 at 1; R. Doc. 74 at 23:17–24:22.
[64] R. Doc. 48-2 at 1.
[65] R. Doc. 68 at 3; R. Doc. 68-2 at 6, 9.
[66] R. Doc. 68 at 3; R. Doc. 68-2 at 2–3; *see* R. Doc. 74 at 62:18–63:3.
[67] R. Doc. 48-2 at 1; R. Doc. 74 at 20:12–21:19.
[68] R. Doc. 48-2 at 3; R. Doc. 74 at 59:22–60:1, 61:14–19.

them in court on October 14, 2026.[69] Omar's counsel represents that the passports were delivered to him before the Government raised the jail calls. The Government contends the passports came in only after it disclosed the calls.[70] The passports remain with Omar's counsel, who represents that he has twice tried to surrender them to Probation without success, because no release order had been signed.[71] Agent Crabtree had no evidence that Omar has any other passport, but he testified a person holding a foreign passport could drive into Mexico and escape overseas from there, and the FBI did not know what other passports Omar might have, and that, in his experience as an FBI counterterrorism agent, passports can be bought in Jordan and Palestine.[72]

***Transfers abroad and assets in this country.*** Between May 15, 2023 and February 9, 2026, Omar made fourteen wire transfers overseas totaling $138,910.[73] Agent Crabtree also testified that Amani, who does not work, transferred approximately $600,000 to $700,000 overseas.[74] The Magistrate Judge noted that no documentary evidence of Amani's transfers was offered as evidence, and that the testimony on this point came from an agent who was not the case agent.[75] When Omar was arrested, the FBI froze all of his known United States bank accounts, seized the money in his house, and seized his cars.[76]

***Recorded calls about money.*** On September 20, 2026, Osama told Omar he had brought $10,000 for Omar, and that another person, Malik, had also sent another $10,000. Osama gave $6,000 of his $10,000 to Amani and $4,000 to Omar's brother Mohammad.[77] In the same series of

---

[69] R. Doc. 74 at 60:2–12, 100:17–101:1; R. Doc. 68 at 2 & n.4.
[70] *Compare* R. Doc. 74 at 100:17–101:1, *with id.* at 77:22–78:8, *and* R. Doc. 48-1 at 7 n.2.
[71] R. Doc. 68 at 2 n.4.
[72] R. Doc. 74 at 60:16–62:15.
[73] *Id.* at 36:3–7, 37:3–6. Agent Crabtree did not identify the recipients of Omar's transfers, and his agreement that the "vast majority" of the transfers went to the Arab Bank concerned Abdel's transfers. *Id.* at 36:21–37:2. The record does not show whether any of Omar's transfers are among those charged in the indictment.
[74] *Id.* at 37:7–19, 63:18–20.
[75] *Id.* at 86:14–87:15.
[76] *Id.* at 57:8–25.
[77] R. Doc. 48-2 at 1; R. Doc. 74 at 22:16–23:6 (testimony that Osama brought $10,000 and that Malik sent another $10,000).

calls, Omar told Amani to keep the important things and the money with a friend or family associate, and told her they must not allow "them" (the FBI) "to fool them again like they did before."[78]

Over the following days, Omar arranged for his Arab Bank debit card to be delivered to Amani's brother, Feras, in Jordan, through a person known as Emad the Barber, so Feras could withdraw money from Omar's account in Arab Bank.[79] When Amani mentioned a safe deposit box on a recorded call, Omar became upset.[80] Omar told Amani that Feras "must cash as much he can and keep the money with him." He said he did not "want the FBI to lock this account too because that is the only money he can hide," and, later in the same call, he said he did not want to name the bank over the telephone.[81] Amani reported that Feras had withdrawn $4,000 and that the balance was $36,000. Omar told her that Feras should keep withdrawing $4,000 at a time until he reached $30,000 and deposit it in Feras's own account, and the remainder of the money could stay in Omar's Arab Bank account.[82] In another call, Omar asked Amani to keep support money offered by people in Jordan "with Feras in case he will need to use it when he gets out of jail to re-establish his business."[83]

On a September 22, 2026 call, Amani said that Mohammad had asked her to wire him all the money in Omar's account in Jordan. According to the call log, "Omar tells Amani to say that she will go back to Jordan, and that he will go to live in Jordan himself when he gets out and will need this money."[84] Omar told Amani, in the same series of calls, to put most of their furniture up

---

[78] R. Doc. 48-2 at 1; R. Doc. 74 at 23:25–24:7.
[79] R. Doc. 48-2 at 2–3; R. Doc. 74 at 23:7–16, 25:13–26:15, 27:9–14.
[80] R. Doc. 48-2 at 2; R. Doc. 74 at 26:19–27:2.
[81] R. Doc. 48-2 at 2–3; R. Doc. 74 at 29:4–7, 30:19–31:12.
[82] R. Doc. 48-2 at 3; R. Doc. 74 at 31:13–21.
[83] R. Doc. 48-2 at 2.
[84] *Id.* at 2; *see* R. Doc. 74 at 27:21–28:4.

for sale, to break the lease on their home, and to move into Abdel's house.[85] He also asked her to tell Feras to continue withdrawing the money and to find a supermarket to open, which Agent Crabtree described as a supermarket overseas.[86]

Agent Crabtree acknowledged the jail calls also concerned hiring lawyers for the family and for Omar, and FBI Language Specialist Salama agreed the family was trying to figure out how to pay the rent and avoid being put out of their home. Crabtree added the calls also used "the code language of . . . getting the money overseas out of his bank account."[87] Omar's financial affidavit identified a foreign bank account, and Omar contends he told the Magistrate Judge at his initial appearance about the account and his plan to open a store with Feras.[88]

***The call about "Shujaie."*** According to the FBI's summary of a September 24, 2026 call, Omar told Amani that Iman should reach out to "Shujaie" and ask him for "the videos when Adam sent the money to feed the people," which Shujaie would send to her. "Adam" is Abdel's nickname. Amani responded that neither she nor Abdel's wife Iman had Shujaie's "account," and Omar said she could ask any of her family members in Palestine to explain what was happening so that they could communicate with Shujaie.[89] Agent Crabtree testified that "Shujaie is Saleem Alzaq," the "Hamas foreign terrorist member that they were sending money to," and he agreed that Alzaq is the person with whom Omar asked his wife to continue to communicate.[90] The call summary itself refers to Iman reaching out to Shujaie and to Amani's family members in Palestine, but it does not describe any earlier communication between Amani and Shujaie.[91] The record does

---

[85] R. Doc. 48-2 at 2–3.
[86] *Id.* at 2, 3; R. Doc. 74 at 31:22–32:2.
[87] R. Doc. 74 at 16:16–23, 58:12–19, 59:18–21.
[88] *Id.* at 78:9–15; R. Doc. 48-1 at 10; R. Doc. 68 at 3; *see* R. Doc. 74 at 58:24–59:16, 100:2–6 (counsel's proffer); *see also id.* at 78:16–20.
[89] R. Doc. 48-2 at 2. R. Doc. 74 at 20:3–5 (identifying "Adam" as Abdel's nickname). Iman is Abdel's wife. *Id.* at 20:6–7, 24:23–25.
[90] R. Doc. 74 at 29:24–30:12, 41:10–16.
[91] R. Doc. 48-2 at 2.

not explain the name or how the FBI connected it to Alzaq. The Government calls it a nickname, and Omar calls it a "supposed alias."[92] Omar contends the call shows he did not know who Shujaie was and that he believed his donations were feeding people in Gaza, not supporting Hamas.[93]

***The proposed custodian.*** Sara Mojahed, Omar's aunt, testified she is close to Omar and has known him all his life. She stayed with his family for two or three weeks in October 2025, speaks regularly with his family, and last spoke with him in July 2026.[94] Ms. Mojahed lives in Youngstown, Ohio. She understands the obligations of a third-party custodian and is willing to come to Louisiana and live with Omar and his family.[95] She does not believe Omar has done or will do anything wrong, and she would follow the Court's instructions, and would go with him if he were allowed to leave home for errands.[96] Asked whether she understood she would be responsible for reporting a violation, she said she was "very sure" Omar would not do anything to hurt her or his family.[97] Asked whether she could monitor Omar's telephone and internet use, she asked why she would need to.[98]

### 4. The Recommendation, the Arguments, and the Release Order

United States Probation's Pretrial Services Office recommended, in an October 6, 2026 addendum, that Omar be released on conditions.[99] The Magistrate Judge treated that recommendation as sufficient to meet the defendants' burden of production under the presumption.[100]

---

[92] R. Doc. 48-1 at 11; R. Doc. 68 at 6.
[93] R. Doc. 68 at 6.
[94] R. Doc. 74 at 67:21–68:18.
[95] *Id.* at 68:19–69:5.
[96] *Id.* at 69:13–71:19.
[97] *Id.* at 71:1–5.
[98] *Id.* at 71:20–22, 72:23–73:3.
[99] *Id.* at 3:15–20, 74:14–22.
[100] *Id.* at 3:15–20.

The Government argued that the charges against Omar are very serious and involve co-conspirators in Florida, New York, and overseas, and the brothers can rely on others in this country and abroad to raise and move money overseas. The Government also pointed to the brothers' overseas travel and to "a total of four houses" overseas, two of them Omar's, and argued the FBI does not know the full extent of the brothers' assets abroad.[101] As to Omar, the Government pointed to his effort to get money out of the account in Jordan without the FBI's knowledge, the call about the passports, and the alleged difference between the account balance discussed on the calls and his financial disclosures.[102]

Omar's counsel argued that Omar is a United States citizen with close ties to the community, that the calls were overwhelmingly about hiring lawyers and keeping the family housed, that Omar disclosed the foreign account, that Omar believed he could not travel without his United States passport, that the family brought the passports to court before the jail calls were raised, and that Ms. Mojahed would be a strict custodian.[103]

The Magistrate Judge described the question as whether the defendants had the means, not merely the incentive, to flee. He observed that any defendant in their situation would have an incentive to flee, but that he had not seen evidence that they had the means to do so without passports and while under location monitoring.[104] He rejected the argument that location monitoring is inadequate merely because a defendant can cut off an ankle monitor, observing that every condition can be circumvented and that reasoning of this type would leave no condition that could be imposed.[105] He also questioned whether "two or three people a network makes."[106] He

[101] *Id.* at 74:24–76:9.
[102] *Id.* at 77:15–79:9.
[103] *Id.* at 99:16–101:16.
[104] *Id.* at 82:16–83:7, 88:1–6, 93:6–21, 94:10–13.
[105] *Id.* at 94:14–95:8.
[106] *Id.* at 96:3–7.

read Omar's statement about living in Jordan as referring to "where they want to go when the dust settles,"[107] and he found that the calls about money indicated a purpose "to live while they are here," not a plan to flee.[108] He also noted that the weight of the evidence on the charges appeared "pretty strong."[109] Calling the question "a close call," he resolved it in favor of release.[110]

The Magistrate Judge ordered Omar released to the custody of Ms. Mojahed, who was to come to this district to fulfill her duties as Omar's third-party custodian. He ordered Omar to surrender his passports and travel documents to Probation within twenty-four hours and not to apply for any passport or travel document during the pendency of the case. He limited Omar's travel to the Eastern District of Louisiana, barred him from possessing a firearm, destructive device, or other dangerous weapon, and ordered him to avoid all contact with any known co-defendant, victim, or witness except in the presence of counsel. He also required Omar to participate in stand-alone location monitoring with GPS technology and to report any contact with law enforcement.[111] He further required each defendant to execute a declaration, under penalty of perjury, identifying all bank accounts in the United States and abroad not already identified, and to consent to the Government's search of any safe deposit box, which no one was to access before the search.[112] He advised Omar of the penalties and consequences of violating the conditions of release, as 18 U.S.C. § 3142(h)(2) requires.[113]

---

[107] *Id.* at 85:3–18.
[108] *Id.* at 91:19–25.
[109] *Id.* at 92:10–18, 114:21–25.
[110] *Id.* at 115:7–11.
[111] *Id.* at 118:11–119:19.
[112] *Id.* at 120:22–121:5.
[113] *Id.* at 122:4–17.

**5. The Stay**

The Magistrate Judge granted the Government's oral motion to stay the release orders until 5:00 p.m. on Friday, October 16, 2026, so the Government could seek review.[114] The Government filed its motion in this Court on October 16, 2026,[115] and the Court stayed the release orders that same afternoon, as a district court may do pending its review.[116] Both defendants are currently in the custody of the United States Marshals Service.

**C. Proceedings in This Court**

The Government asks this Court to revoke the release order. It argues that Omar is a serious flight risk because of the charges, a potential Guidelines sentence of 210 to 262 months if a terrorism enhancement is applied at sentencing, his property and family abroad, the funds he received and sought to keep abroad after his arrest, the gap between those funds and his financial disclosures, the call about the passports, and his ability to obtain new passports.[117] It also argues Ms. Mojahed cannot supervise him, and that Omar poses a danger because he sought to communicate with Saleem Alzaq after he was charged.[118]

Omar responds that the Government offers no new information, that the Magistrate Judge's conditions address any risk of flight, and that the Government has not shown danger. He relies on his citizenship and ties here, his custodian, the voluntary delivery of his passports, and records showing the apartment in Jordan belongs to Amani, and that no property is registered to him in Jordan or Palestine.[119] He argues that the calls about money reflect a family trying to survive after

---

[114] *Id.* at 115:19–116:13, 121:6–10.
[115] R. Doc. 48.
[116] R. Doc. 49; *see* 18 U.S.C. § 3145(a); *United States v. Brigham*, 569 F.3d 220, 230 (5th Cir. 2009) (explaining that without that authority a released defendant could flee or cause harm before the court rules, which "could render the district court's review power illusory," and that the requirement that the motion "be determined promptly" protects the defendant from prolonged interim detention).
[117] R. Doc. 48-1 at 7–11.
[118] *Id.* at 10–13.
[119] R. Doc. 68 at 1–3.

its accounts and business were seized, that the call about Shujaie sought evidence that his money was sent to feed people in Gaza, and that he did not flee after learning of the investigation.[120] He also disputes the Government's sentencing calculation,[121] and cites release orders entered in other terrorism prosecutions.[122] In reply, the Government argues the presumption and the strength of the evidence support detention, that Omar himself sent money twenty-five times after October 7, 2023, that he likely faces a lengthy Guidelines sentence, and that the Magistrate Judge did not weigh the presumption against the evidence.[123]

The Court set the Government's motion for hearing on October 26, 2026, and later reset it to October 29, 2026, as to both defendants.[124] After Abdel's counsel withdrew, Abdel moved to continue, and the Court granted that motion as to Abdel only, resetting Abdel's hearing to November 6, 2026.[125] The Court held a hearing as to Omar on October 29, 2026, at which the Government called two witnesses and offered one exhibit, and both sides presented argument.[126]

At the hearing, the Government called Detective John Wiebelt of the Jefferson Parish Sheriff's Office, who also serves as a task force officer with the FBI.[127] He testified that a person in custody in St. Tammany Parish jail, and who had worked as a confidential source before and whose information had proved reliable in other investigations, first tried to contact law enforcement on his own initiative before the Magistrate Judge detention hearing, and that the interview took place some weeks later. Detective Wiebelt interviewed the witness with another task force officer, the prosecutor, and the witness' own counsel present. According to Wiebelt's

---

[120] *Id.* at 1–3, 5–8.
[121] *Id.* at 8 (citing *United States v. Khan*, 938 F.3d 713 (5th Cir. 2019)).
[122] R. Doc. 68 at 8–9; R. Doc. 68-3.
[123] R. Doc. 69 at 2–5.
[124] R. Doc. 53; R. Doc. 60 (granting R. Doc. 57).
[125] R. Docs. 61, 63.
[126] R. Doc. 72.
[127] *See id.* (stating John Wiebelt testified).

testimony, the witness said he was housed with Abdel, and Abdel told him that, upon his release, he would leave the country for Palestine by way of Mexico. Detective Wiebelt testified that the witness also said the brothers had resources, property, and money *there*. Detective Wiebelt's report of the interview, which was admitted as Government Exhibit 1 with portions redacted because of Government concern for other investigations, shows Abdel as saying he would make that trip.[128]

Detective Wiebelt testified the witness also said Abdel's brother would go with him. Wiebelt acknowledged his report does not include any statement about Omar, and he attributed this omission to his own mistake. On redirect, Wiebelt agreed he had no doubt the confidential informant had said "they." Detective Wiebelt was not aware of the witness having any direct conversation with Omar, who is housed in a separate dormitory. Detective Wiebelt testified, however, that the witness saw the brothers communicating with one another at some point, and Wiebelt testified that, according to the witness, the witness heard Abdel say Omar's name and saw Abdel speak through the gap in a locked door between their two dormitories in a language other than English. Wiebelt is not the case agent, and the Government represented that his testimony was limited to the interview.

The Government then called Amy LaPointe, the federal probation officer who prepared Omar's Pretrial Services report.[129] Officer LaPointe testified that, in light of overseas and financial assets of which her office had not previously been aware, together with the apparent statement of a willingness to flee, her office no longer believes that the conditions it had recommended would adequately address Omar's risk of flight. She acknowledged that Omar did not make the statement on which she relied, and she could not say whether either consideration alone would have changed the recommendation.

---

[128] R. Doc. 72-1.
[129] *See* R. Doc. 72 (referencing Amy LaPointe testifying).

In argument, the Government contended the presumption had not been rebutted, that a third-party custodian is not enough to shift the burden, and that the Magistrate Judge did not weigh the presumption. It argued that Omar could leave without a passport by crossing a border illegally and could obtain new travel documents abroad, that his calls show resources and people abroad willing to help him, and that the joint conduct alleged in the indictment corroborates the witness' account. It also relied on the call about "Shujaie" as evidence of danger.

Omar's counsel argued the jailhouse statements were Abdel's, not Omar's, and the report itself did not contain the testimony on which the Government relied as to Omar. He argued again that Omar's family delivered his passports to counsel before the Government raised the issue, that Omar has said he cannot leave the United States on a Jordanian passport, that Omar would sign a declaration of foreign accounts and consent to a search of his safe deposit box, and that neither brother fled after learning of the investigation. He also argued the Government failed to show danger by clear and convincing evidence. Omar's counsel also argued that it was suspect that the Mexican escape route the confidential source described echoed the same scenario discussed at the detention hearing, where Agent Crabtree testified that a person with a foreign passport could theoretically drive into Mexico and flee U.S. authority from there.[130] The Government responded that the witness had no contact with it before coming forward and could not have known what was said in court. The witness was interviewed after the detention hearing, and the record does not show when Abdel allegedly made the statement reported by the witness.

---

[130] *See* R. Doc. 74 at 61:5–62:1.

## III. LEGAL STANDARD

### A. Review of the Magistrate Judge's Order

When a magistrate judge orders a person released, "the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release," and "[t]he motion shall be determined promptly."[131] When a district court reviews a magistrate judge's release or detention order, it "acts *de novo* and makes an independent determination of the proper pretrial detention or conditions for release."[132] That rule "applies not only when the accused challenges the magistrate's order, but also when the government does, as it is authorized to do by section 3145(a)(1)," and in that situation "the district court, making an independent determination, can order pretrial detention even though the magistrate has refused to do so."[133] The Court is therefore not bound by the Magistrate Judge's findings or conclusions, and gives them no deference. A district court judge can decide the motion on the record developed before the Magistrate Judge, or it may take additional evidence, and its review is "as unfettered as it would be if the district court were considering whether to amend [its] own action."[134]

The Court has carefully reviewed the transcript of the detention hearing before the Magistrate Judge, the exhibits, and the parties' submissions, and it has considered the evidence presented at the hearing before it on October 29, 2026, and it is prepared to rule as to Omar.

---

[131] 18 U.S.C. § 3145(a).
[132] *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985); *see also United States v. Rueben*, 974 F.2d 580, 585–86 (5th Cir. 1992).
[133] *Fortna*, 769 F.2d at 249 (citing *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985)).
[134] *Fortna*, 769 F.2d at 249–50; *United States v. Thibodeaux*, 663 F.2d 520, 522 (5th Cir. 1981) (decided under the prior Act, 18 U.S.C. § 3147 (1982) (repealed 1984)).

### B. The Bail Reform Act

The Bail Reform Act of 1984 reflects the principle that, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[135] A judicial officer must order a defendant released on personal recognizance or an unsecured appearance bond, or on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance and the safety of the community, unless detention is warranted under § 3142(e).[136] Section 3142 is not to be construed as modifying or limiting the presumption of innocence.[137]

A detention hearing may be held only in the circumstances listed in § 3142(f)(1) and (f)(2).[138] Subsection (f)(1)(A) permits a hearing on the Government's motion in a case that involves "an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed."[139] A defendant's dangerousness, standing alone, does not justify detention unless the case first falls within one of the categories listed in § 3142(f).[140]

If, after a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial."[141] The Fifth Circuit reads this provision in the disjunctive. Detention is warranted if no condition or combination of conditions will reasonably assure either the defendant's appearance *or* the safety of others and the community.[142]

---

[135] *United States v. Salerno*, 481 U.S. 739, 755 (1987).
[136] 18 U.S.C. § 3142(a), (b), (c)(1)(B).
[137] *Id.* § 3142(j).
[138] *United States v. Byrd*, 969 F.2d 106, 109–10 (5th Cir. 1992) (per curiam); *see also Rueben*, 974 F.2d at 581.
[139] 18 U.S.C. § 3142(f)(1)(A).
[140] *Byrd*, 969 F.2d at 110–11.
[141] 18 U.S.C. § 3142(e)(1).
[142] *Rueben*, 974 F.2d at 586; *Fortna*, 769 F.2d at 249.

The Government bears the burden of persuasion on both grounds, though the standards differ. A finding that no condition or combination of conditions will reasonably assure the defendant's appearance must be supported by a preponderance of the evidence.[143] The standard is "reasonably assure appearance, not 'guarantee' appearance."[144] A finding that no condition or combination of conditions will reasonably assure the safety of any other person and the community, on the other hand, must be supported by clear and convincing evidence.[145] The rules of evidence do not apply at the hearing, and the parties may proceed by proffer.[146] The Court may consider hearsay, and it may rest a detention decision on hearsay "where it is sufficiently reliable."[147]

### C. The Statutory Presumption

The Act creates a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance and the safety of the community if the judicial officer finds probable cause to believe that the defendant committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed."[148] The presumption shifts to the defendant only the burden of producing rebutting evidence, not the burden of persuasion.[149] Even when the defendant produces rebutting evidence, however, the presumption does not disappear. It "remains in the case and is a factor to be considered by the judicial officer."[150]

---

[143] *Fortna*, 769 F.2d at 250.
[144] *Id.*
[145] 18 U.S.C. § 3142(f); *Fortna*, 769 F.2d at 250.
[146] 18 U.S.C. § 3142(f) ("The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."); *id.* (affording the person the opportunity "to present information by proffer or otherwise").
[147] *United States v. Acevedo-Ramos*, 755 F.2d 203, 208 (1st Cir. 1985); *see also Fortna*, 769 F.2d at 250–51.
[148] 18 U.S.C. § 3142(e)(3)(C).
[149] *United States v. Barker*, 876 F.2d 475, 476 (5th Cir. 1989) (per curiam); *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989).
[150] *Fortna*, 769 F.2d at 251; *see also Barker*, 876 F.2d at 476 (the presumption "does not disappear, but remains in the case to be considered by the court"); *Hare*, 873 F.2d at 798–99.

### D. The Factors the Court Must Consider

In determining whether any condition or combination of conditions will reasonably assure the defendant's appearance and the safety of the community, the Court must take into account the available information concerning four factors. These are (1) the nature and circumstances of the offense charged, including whether the offense is a federal crime of terrorism, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.[151]

## IV. DISCUSSION

### A. The Case Falls Within § 3142(f)(1)(A)

Omar is charged with providing, and conspiring to provide, material support to a designated foreign terrorist organization in violation of § 2339B. Section 2339B is an offense listed in § 2332b(g)(5)(B), and it carries a maximum term of imprisonment of more than ten years.[152] A detention hearing was therefore authorized under § 3142(f)(1)(A), and the Court may consider both the risk of nonappearance and the danger Omar's release would pose.[153]

### B. The Presumption Applies, but Omar Has Rebutted It

A grand jury has returned an indictment charging Omar with two violations of § 2339B. The indictment establishes probable cause to believe that Omar committed an offense listed in § 2332b(g)(5)(B) for which the maximum term of imprisonment is ten years or more.[154] The

[151] 18 U.S.C. § 3142(g); *see Fortna*, 769 F.2d at 252.
[152] 18 U.S.C. § 2332b(g)(5)(B)(i) (listing "2339B (relating to providing material support to terrorist organizations)"); *id.* § 2339B(a)(1).
[153] *Id.* § 3142(f)(1)(A); *see Byrd*, 969 F.2d at 109–10.
[154] R. Doc. 9; *see United States v. Trosper*, 809 F.2d 1107, 1110 (5th Cir. 1987) (rejecting the argument that the presumption requires a showing of probable cause independent of the indictment and holding that the presumption "was properly applied to [the defendant] upon proof that he had been indicted under the Controlled Substances Act").

presumption that no condition or combination of conditions will reasonably assure Omar's appearance and the safety of the community therefore applies.[155]

Omar is charged in the same indictment as his brother, and much of the evidence concerns both of them. Co-defendants are not detained or released as a group, however. "[N]o two defendants are likely to have the same pedigree or to occupy the same position."[156] The Court's determination is "a case-by-case, factual determination."[157] The Court therefore considers the evidence as it bears on Omar, and it does not attribute to Omar the statements or conduct of his brother, except where the record ties them to Omar.

Omar has produced evidence to rebut the presumption. He is a United States citizen with no criminal convictions who has lived in this area for six years with his now-pregnant wife and young children, and his parents live here as well.[158] His counsel represents that the family delivered his United States and Jordanian passports to counsel so they could be surrendered, and Agent Crabtree had no evidence that Omar holds any other passport.[159] He proposed his aunt, Sara Mojahed, who has known him all his life, as a third-party custodian willing to move to Louisiana and live with him.[160] The Pretrial Services Office recommended his release on conditions,[161] but that office withdrew its recommendation at the hearing before this Court.[162] The Court finds that this evidence, even without the recommendation, satisfies Omar's burden of production. The

---

[155] 18 U.S.C. § 3142(e)(3)(C); *see United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (summary order) ("Where, as here, a defendant has been indicted for violating 18 U.S.C. § 2339B(a)(1), a rebuttable presumption arises that no conditions can provide the requisite assurances."); *United States v. Saab*, No. 19 Cr. 676 (PGG), 2021 WL 5868157, at *18 (S.D.N.Y. Dec. 10, 2021) (applying § 3142(e)(3)(C) to charges under § 2339B).

[156] *United States v. Stanford*, 630 F. Supp. 2d 751, 755 n.5 (S.D. Tex.) (quoting *United States v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990)), *aff'd*, 341 F. App'x 979 (5th Cir. 2009) (per curiam).

[157] *Stanford*, 630 F. Supp. 2d at 755 n.5.

[158] R. Doc. 68 at 1–2.

[159] R. Doc. 74 at 60:2–12, 62:10–15, 100:17–101:1; R. Doc. 68 at 2 & n.4.

[160] R. Doc. 74 at 67:21–69:5.

[161] *Id.* at 3:15–20, 74:14–22.

[162] *See* R. Doc. 72 (referencing Amy LaPointe testifying).

presumption nevertheless remains in the case, however, and the Court weighs it together with the factors in § 3142(g).

The Government argues the Magistrate Judge did not weigh the presumption against the evidence.[163] On de novo review, this Court has weighed the presumption together with the other evidence. The Fifth Circuit has explained, in the context of drug offenses, for example, that the mere production of rebutting evidence does not completely rebut the presumption, and the court may still consider Congress's finding that those offenders pose a special risk of flight and dangerousness to society.[164] More broadly, the presumption "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial,"[165] and Congress placed the terrorism offenses listed in § 2332b(g)(5)(B) among those classes.[166]

### C. The Nature and Circumstances of the Offenses Charged

The first factor directs the Court to consider the nature and circumstances of the offenses charged, "including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device."[167] Section 2339B is listed in § 2332b(g)(5)(B), but a listed offense is a "Federal crime of terrorism" only if it also is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."[168] The gateway in § 3142(f)(1)(A) and the presumption in § 3142(e)(3)(C) depend on whether the offense is listed in § 2332b(g)(5)(B) and carries a maximum term of imprisonment of ten years or more, not on § 2332b(g)(5)(A). The Court need not decide in this instance whether the charged

---

[163] R. Doc. 69 at 4–5.
[164] *Rueben*, 974 F.2d at 586; *Hare*, 873 F.2d at 798–99.
[165] *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).
[166] 18 U.S.C. § 3142(e)(3)(C).
[167] *Id.* § 3142(g)(1).
[168] *Id.* § 2332b(g)(5)(A)–(B); *see United States v. Khan*, 938 F.3d 713, 716, 719 (5th Cir. 2019) (whether a § 2339B offense meets this requirement is a factual question for the district court).

offenses meet that additional requirement as to Omar because regardless of whether they are Federal crimes of terrorism, the charges against Omar which concern material support to a designated foreign terrorist organization are among the most serious crimes in the federal criminal code.

Congress has found that foreign terrorist organizations "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct," and the Supreme Court has recognized that material support, even in forms that appear benign, frees up other resources the organization may use for violent ends and lends legitimacy to foreign terrorist organizations, which in turn makes it easier for these organizations "to persist, to recruit members, and to raise funds."[169] The Government contends that Omar and Abdel made at least 137 transfers to Hamas since October 2023, disguised as humanitarian support for those in need.[170] The charged scheme allegedly moved funds through PayPal to an intermediary association that converted the funds into cryptocurrency.[171]

The penalties Omar faces also bear on the risk of flight. He faces up to twenty years of imprisonment on each material-support count, and up to eighty years in the aggregate if convicted on all counts.[172] A lengthy potential sentence gives a defendant a strong incentive to flee.[173] The parties dispute whether the terrorism enhancement in § 3A1.4 of the Sentencing Guidelines would apply.[174] The Court need not resolve that dispute now. Even without the enhancement, the statutory

---

[169] *Holder v. Humanitarian L. Project*, 561 U.S. 1, 7, 29–30 (2010) (quoting Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301(a)(7), 110 Stat. 1214, 1247 (codified at 18 U.S.C. § 2339B note)).
[170] R. Doc. 48-1 at 5 (citing R. Doc. 9).
[171] R. Doc. 74 at 39:19–40:5.
[172] *See* 18 U.S.C. §§ 1343, 1349, 1956(a)(2), (h), 2339B(a)(1).
[173] *See Khusanov*, 731 F. App'x at 21 (sentence exposure of even fifteen years is "sufficient to provide [the defendant] with a strong incentive to flee"); *United States v. Stanford*, 341 F. App'x 979, 982, 984 (5th Cir. 2009) (per curiam).
[174] *Compare* R. Doc. 48-1 at 11, *with* R. Doc. 68 at 8, *and* R. Doc. 69 at 4 (citing *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011)).

exposure is substantial. Of course, the Court recognizes the nature of the charges and the length of the potential sentence would not, standing alone, justify detention.[175]

This factor weighs heavily in favor of detention.

**D. The Weight of the Evidence Against Omar**

The second factor is "the weight of the evidence against the person."[176] This factor does not call for a determination of guilt, and the Court's consideration of it does not modify or limit the presumption of innocence.[177] The Court analyzes this factor on the information actually presented, not on the indictment and the presumption alone.[178] Courts in this circuit have described the weight of the evidence as the least important of the four factors.[179]

The Court has already described the Government's contentions about the charged conduct.[180] The Government contends Omar himself sent money twenty-five times after October 7, 2023, through the association in France.[181] He responds that the indictment attributes to him only about $11,000 of the transfers, most of them to an organization in France, and that his messages with Alzaq are brief and innocuous.[182] The hearing before this Court did not add to the evidence concerning Omar's transfers or messages. The Magistrate Judge, who had reviewed the complaints and the indictment, observed that the weight of the evidence appeared "pretty strong."[183]

---

[175] *See United States v. Jackson*, 845 F.2d 1262, 1266 (5th Cir. 1988); *United States v. Good*, No. 25-196, 2025 WL 2613628, at *6 (E.D. La. Sept. 10, 2025).
[176] 18 U.S.C. § 3142(g)(2).
[177] *See id.* § 3142(j).
[178] *See Jackson*, 845 F.2d at 1266 ("[T]he government cannot reasonably argue that the § 3142(e) presumption, coupled with the allegations of the indictment against [the defendant], are alone sufficient to satisfy § 3142(g).").
[179] *United States v. Fuentes*, No. 25-88, 2026 WL 947905, at *7 (E.D. La. Apr. 8, 2026); *Stanford*, 630 F. Supp. 2d at 755.
[180] *See* R. Doc. 48-1 at 5–6 (citing R. Doc. 9).
[181] R. Doc. 69 at 3 (citing R. Doc. 9).
[182] R. Doc. 68 at 5–6.
[183] R. Doc. 74 at 92:10–18.

The Government presented its evidence at the detention hearing chiefly through Agent Crabtree, who reviewed the jail calls, summaries, and documents in the investigation, and through Language Specialist Salama, who summarized the calls.[184] The call summaries are not verbatim translations, and Salama agreed that some Arabic terms, including the word he translated or summarized as "hide," can carry a more innocent meaning, and he testified the meaning of that word "depends on the context."[185] The Court has taken that testimony into account and relies on the summaries only to the extent the surrounding context supports them. Agent Crabtree was not the case agent assigned to either brother, and his testimony rested in part on summaries prepared by others.[186] No case agent testified at the hearing before this Court either. Hearsay and summarized statements of this kind may properly be considered at a detention hearing, but the Court has also considered their source in deciding how much weight to give them.[187] Agent Crabtree testified under oath and was cross-examined, and he identified the sources on which his testimony rested, including bank records, the recorded calls, and the Government's exhibits. In an opinion written by then-Judge Breyer, the First Circuit found hearsay testimony with those features sufficiently reliable to support a detention finding.[188] Omar has not challenged the accuracy of the call summaries on which the Court relies. Indeed, his opposition relies on them.[189]

This factor weighs only slightly in favor of detention.

---

[184] *Id.* at 6:10–17, 19:4–22.
[185] *Id.* at 13:19–14:24, 17:3–22.
[186] *Id.* at 19:4–18.
[187] *See* 18 U.S.C. § 3142(f); *Fortna*, 769 F.2d at 250–51.
[188] *See Acevedo-Ramos*, 755 F.2d at 208 (finding hearsay sufficiently reliable where the agent testified under oath, his testimony was "for the most part detailed and consistent," he described "the nature of the evidentiary sources upon which [he] relied," and cross-examination "provided at least some check" on his veracity).
[189] R. Doc. 68 at 2–3 (citing R. Doc. 48-2), 6; *see Acevedo-Ramos*, 755 F.2d at 207–09 (explaining that the court may insist on "the production of the underlying evidence or evidentiary sources where their accuracy is in question," and that the defendant's failure to challenge the agent's descriptions "tends to justify" accepting them).

### E. Omar's History and Characteristics

The third factor requires the Court to consider Omar's history and characteristics, including his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," and whether, at the time of the current offense or arrest, he "was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence."[190]

#### 1. Foreign ties, travel, and passports

Omar holds a Jordanian passport as well as a United States passport, and the Government represents that he also holds Palestinian citizenship.[191] A defendant's foreign citizenship bears on the risk of flight, even for a United States citizen who also holds citizenship elsewhere.[192] He travels abroad regularly, most recently returning from Doha on August 2, 2026.[193] The apartment in Amman was registered to Amani about three months before Omar's arrest and about a month after Abdel, according to the indictment, reportedly told Omar of an investigation into their donations.[194] The record does not show what the apartment cost or how it was paid for, and Omar returned to the United States after it was registered.[195] The Court therefore gives the timing some weight, but only as it bears on whether Omar has a place to go. Whether Omar himself owns property abroad is disputed. The calls refer to "Omar's house in Jordan" and "Omar's house in

---

[190] 18 U.S.C. § 3142(g)(3)(A)–(B).

[191] R. Doc. 74 at 59:22–60:12; R. Doc. 48-1 at 11; R. Doc. 68-2 at 6 (Jordanian land certificate listing his nationality as Palestinian).

[192] *See United States v. Esquivel-Bataz*, 155 F.4th 491, 493 (5th Cir. 2025) ("We see no abuse of discretion in the court's relying on [her Mexican alienage and criminal history] to deny pretrial release."); *Stanford*, 630 F. Supp. 2d at 754–56 (involving a defendant who was a citizen of both the United States and Antigua and Barbuda).

[193] R. Doc. 74 at 34:14–35:2.

[194] R. Doc. 68-2 at 2–3; R. Doc. 68 at 7 (citing R. Doc. 9 at 26). The registration fees were paid on June 11, 2026. R. Doc. 68-2 at 3.

[195] R. Doc. 74 at 34:20–35:2, 63:4–13.

Palestine," and the records Omar has submitted show no property registered to him, within the limits described above.[196] The Court need not resolve whether the house described on the calls is the apartment registered to Amani. In either event, the calls show that Omar regards a residence in Jordan as available to his family, and that he was determined to keep it. The Act requires the Court to be "concerned with realities, not formalities."[197]

The parties disagree about the meaning of Omar's statement, described above, that he would go live in Jordan when he gets out and would need the money in the Jordan account. The Government reads it as a plan to flee, and the Magistrate Judge read it as referring to where the family wanted to go "when the dust settles."[198] Because Omar made the statement in response to Mohammad's request for the money, and told Amani to "say" it, the Court recognizes that it may have been offered as a reason not to send the money to Mohammad, and it gives the statement some weight.[199] Even so, it shows that, within days of his arrest, Omar regarded Jordan as a place where he could live and the account there as money he would need if he did.

The Court gives little weight to the call about the passports. Language Specialist Salama agreed that the word he summarized as "hide" can also mean to set aside or save, and that the summary is not a verbatim translation.[200] The more innocent reading is that the call reflects concern for keeping the family's passports and valuables safe. Omar later told Amani he could not leave the United States on his Jordanian passport, and, according to his counsel, his family delivered

---

[196] R. Doc. 48-2 at 1; R. Doc. 68-2 at 6, 9.
[197] *United States v. Fuentes*, No. 25-88, 2026 WL 1090772, at *7 (E.D. La. Apr. 22, 2026), *appeal dismissed*, No. 26-30314 (5th Cir. June 17, 2026).
[198] R. Doc. 74 at 84:23–85:18.
[199] R. Doc. 48-2 at 2.
[200] *Id.* at 1; R. Doc. 74 at 13:19–14:24, 20:12–21:19.

both passports to counsel, who still holds them.[201] Although the timing of their delivery is disputed, the delivery of the passports weighs in Omar's favor.[202]

The Government contends Omar could obtain new passports, relying on Agent Crabtree's testimony that passports can be bought in Jordan and Palestine and on the fictitious Jordanian passport found in Raed Yousef's home.[203] That evidence lends some support to the point that false Jordanian travel documents can be obtained.[204] It does not show, however, that Omar has such a document or has tried to obtain one. Agent Crabtree had no evidence that Omar has any other passport, and the false passport was found in the home of Abdel's best friend, not in Omar's home.[205]

The testimony at the hearing before this Court does not alter this analysis. The Court has considered that the witness had worked as a confidential source before, that his information had proved reliable in other investigations, and that he came forward on his own. The account is nevertheless hearsay twice over, a statement by Abdel as related by the witness and then by Detective Wiebelt, and its reliability affects the weight it receives.[206] Several features of the account limit that weight. Detective Wiebelt's report attributes the plan to Abdel alone, and the statement that Abdel's brother would join him appears only in his testimony, not in the report he prepared following his interview of the witness.[207] Moreover, to Detective Wiebelt's knowledge, the confidential witness never spoke directly with Omar, and although Detective Wiebelt testified the witness saw the brothers communicating, the testimony describes only Abdel speaking through

---

[201] R. Doc. 48-2 at 3; R. Doc. 74 at 59:22–60:1, 100:17–24. Counsel also confirmed that he is still in possession of the passports at the October 29, 2026 hearing.
[202] *Compare* R. Doc. 74 at 100:17–101:1, *with id.* at 77:22–78:8; R. Doc. 68 at 2 n.4.
[203] R. Doc. 48-1 at 11; R. Doc. 74 at 61:5–62:9, 90:10–20.
[204] R. Doc. 74 at 62:1–9; *cf. Trosper*, 809 F.2d at 1109–11 (affirming detention where the defendant possessed a passport bearing his photograph in another name and other false identification materials).
[205] R. Doc. 74 at 62:10–15, 65:7–9; *see also id.* at 90:21–91:10.
[206] *See* 18 U.S.C. § 3142(f); *Acevedo-Ramos*, 755 F.2d at 207–08.
[207] *See* R. Doc. 72-1.

a door and does not show that the witness understood what was said. The witness also gave his account after the detention hearing at which fleeing through Mexico was raised as a possibility, and the record does not show when Abdel allegedly made the statement. The Court therefore gives the testimony little weight. The Court does not attribute Abdel's reported statement to Omar, and the Court's finding as to Omar does not rest on the statement of the jailhouse witness.

**2. Financial resources and access to funds**

The Fifth Circuit has recognized that financial assets that are "liquid and secretive" may be "more likely to provide a means to flee than a reason to stay."[208] It has also affirmed the detention of a defendant who "demonstrated an ability to access funds from acquaintances even if his own assets are frozen."[209]

The freezing of Omar's accounts and the seizure of his cash and cars have left him with limited resources in this country. His resources abroad stand on a different footing, however. He made fourteen wire transfers overseas totaling $138,910 between May 2023 and February 2026.[210] The Court gives limited weight to Agent Crabtree's testimony that Amani transferred approximately $600,000 to $700,000 overseas, because no documentary evidence of those transfers was offered.[211]

Omar's recorded calls after his arrest, as the Court has described above, bear more directly on his foreign ties. Within days of his arrest, while his accounts here were frozen, Osama and Malik brought or sent $20,000 for him. Omar arranged for his debit card to be carried to Jordan so that Feras could withdraw up to $30,000 and hold it in Feras's own account, asked that support

[208] *Trosper*, 809 F.2d at 1110–11.
[209] *Stanford*, 341 F. App'x at 984.
[210] R. Doc. 74 at 36:3–7, 37:3–6; *see also id.* at 57:8–25 (freezing of Omar's accounts and seizure of his cash and cars).
[211] *Id.* at 37:7–17, 86:14–87:15.

money from people in Jordan be kept in Jordan with Feras for his use when he gets out of jail, and he avoided naming the bank over the telephone, saying that he did not want the FBI to lock "the only money he can hide."[212]

The Court certainly recognizes that a defendant whose accounts have been frozen and whose business has been shut down may legitimately seek funds to support his family and pay for his defense, and it does not hold that need against Omar. The Magistrate Judge viewed the calls in that light,[213] and some of the calls do concern the rent, the lease, and the cost of lawyers.[214] Omar also identified a foreign bank account on his financial affidavit.[215] The summaries also reflect that Omar and Amani took comfort that Feras would put the money aside so that, upon Omar's release, Omar could start a new business.[216] The calls described above went further, however, because they concerned keeping money abroad, in the hands of a relative, and beyond the reach of the FBI. One business discussed on the calls was a supermarket to be opened overseas, which Omar's counsel described as a store Omar and Feras were trying to open in Jordan, although other calls discussed reopening the family's stores here and selling Omar's house in Palestine to start a new business in this country.[217] The record does not show whether any of those funds have been used for living expenses or legal fees here. Those are the kind of "liquid and secretive" assets that are "more likely to provide a means to flee than a reason to stay,"[218] and the calls show, as in *Stanford*, an ability to obtain funds through others even while his own assets are frozen.[219]

---

[212] R. Doc. 48-2 at 1–3; R. Doc. 74 at 26:5–15, 27:3–8, 29:4–7, 31:4–21; *see also id.* at 22:16–25 (the $20,000 from Osama and Malik).
[213] R. Doc. 74 at 88:20–89:9, 91:19–25.
[214] *Id.* at 16:16–23, 58:12–19, 59:18–21; R. Doc. 48-2 at 2–3.
[215] R. Doc. 74 at 78:9–15; R. Doc. 48-1 at 10; *see* R. Doc. 68 at 3.
[216] R. Doc. 48-2 at 3.
[217] *Id.* at 1–3; R. Doc. 74 at 31:22–32:2, 100:2–6.
[218] *Trosper*, 809 F.2d at 1110–11.
[219] *Stanford*, 341 F. App'x at 983–84.

The Magistrate Judge questioned whether "two or three people a network makes."[220] But, on this Court's review, the record identifies more than that. Beyond Feras, Osama, and Malik, the last of whom asked Osama not to tell Omar about his contribution, the summaries describe Omar's brother Mohammad and his father taking what the translator understood to be Omar's debit card to Emad the barber, who was to bring it to Feras in Jordan.[221] The summaries also describe a person called Abu-Rani who "will collect another amount for them."[222] Omar also asked that Feras's telephone number be given to Mohammad and Emad so others could "communicate with each other without having to cross him."[223] These accounts come from summaries of the calls, not verbatim translations, and the Court has weighed them with that in mind.[224] Even so, the question is not the size of the network but whether people beyond the reach of any condition the Court could impose stand ready to supply Omar with funds abroad. On this record, they do.

### 3. Family and community ties, employment, and length of residence

Omar has meaningful ties to this district. He has lived in the area for six years with his wife and two young children, his wife is expecting their third child, his parents live here, and until the searches he was a part owner of two local stores and his young family's primary or only source of income.[225] Ms. Mojahed testified that she has stayed with Omar and his family in Louisiana and speaks regularly with his family.[226] Those ties weigh in his favor.

---

[220] R. Doc. 74 at 96:3–7.
[221] R. Doc. 48-2 at 1–2; R. Doc. 48-1 at 9; R. Doc. 74 at 22:16–23:16, 40:20–22 (identifying Mohammad as the brothers' brother).
[222] R. Doc. 48-2 at 3. Another summary refers to Feras himself as "Abu-Rania." *Id.* at 2. The record does not show whether Abu-Rani is a different person.
[223] *Id.* at 2.
[224] R. Doc. 74 at 9:14–23, 13:19–14:8.
[225] R. Doc. 68 at 1–2; R. Doc. 74 at 57:14–15, 58:6–11.
[226] R. Doc. 74 at 68:4–18.

Considerable evidence of longstanding ties to the district may rebut the presumption of flight.[227] Family ties, home ownership, and employment do not necessarily do so, however, particularly where the property may be subject to forfeiture or the employment is connected to the charged conduct.[228] Family ties weigh most heavily when they show a defendant "is so deeply committed and personally attached" to the community "that he cannot be driven from it by the threat of a long prison sentence."[229] Omar's ties here are tempered by his wife's apartment in Amman, by the calls about the residence in Jordan, and by the seizure of the stores that were his principal economic tie to this district. After his arrest, Omar also told Amani to give up the lease on their home and move into Abdel's house, an instruction at least as consistent with the family's finances after its accounts were frozen as it was with the weakening of Omar's ties here.[230]

**4. Criminal history, past conduct, and record of court appearances**

Omar has no prior convictions, and nothing in the record suggests he has ever failed to appear in court.[231] Asked whether there are state charges against "the defendants," however, Agent Crabtree said that there are, for benefits fraud,[232] and on a recorded call after his arrest, Omar asked why both he and Amani had been charged with the same Medicaid fraud.[233] As with many gaps in the evidentiary record in this case, the record does not show when those charges were brought or whether Omar was on release on them when he was arrested on the federal charges.[234] The Court therefore gives the pending charge limited weight.

This factor weighs slightly in Omar's favor.

---

[227] *Rueben*, 974 F.2d at 586 (citing *Jackson*, 845 F.2d at 1266).
[228] *Rueben*, 974 F.2d at 586–87; *see also Trosper*, 809 F.2d at 1110–11.
[229] *Rueben*, 974 F.2d at 586.
[230] R. Doc. 48-2 at 2–3.
[231] R. Doc. 68 at 1.
[232] R. Doc. 74 at 37:20–24.
[233] R. Doc. 48-2 at 2.
[234] *See* 18 U.S.C. § 3142(g)(3)(B).

### 5. Character, physical and mental condition, and history of substance abuse

No information was presented concerning Omar's physical or mental condition or any history of substance abuse. Therefore, there is nothing for the Court to analyze regarding this factor.

### 6. Conduct before and after arrest

Omar's conduct before his arrest weighs in his favor. According to the indictment, on which Omar relies, Abdel told him in May 2026 of an investigation into their donations, and, according to his counsel, Omar's telephone was seized when he left the country in June 2026. He nonetheless returned to the United States on August 2, 2026, and was arrested here.[235] That conduct is not dispositive. When Omar returned, he had not been charged, his accounts, cash, cars, and business had not been seized, and he did not yet face a lengthy federal sentence. In other words, when he came back, he had a lot to come back to in this country. A defendant's earlier decision to remain in or return to the United States does not foreclose a finding that he now presents a risk of flight.[236] His recorded efforts after his arrest to keep the Jordan funds from the FBI, however, also bear on this factor.

Considered together, these circumstances weigh in favor of detention. Omar's ties here, his record, and the delivery of his passports weigh in his favor. But, they are outweighed by his ties to Jordan and by his recorded efforts, after his assets in this country were frozen, to secure funds held abroad by a relative.

---

[235] R. Doc. 68 at 7 (citing R. Doc. 9 at 26); R. Doc. 74 at 34:20–35:2; *see also id.* at 102:8–15 (Government's statement that, when Omar traveled overseas, his phone "was done by CBP"), 111:21–24 (counsel's statement that Omar's phone was seized in June 2026 when he left the country).

[236] *See United States v. Faulkner*, No. 3:18-MJ-407-BT, 2018 WL 3659068, at *4 (N.D. Tex. Aug. 2, 2018) (rejecting the argument that the defendant's return to the United States after learning of the charges showed he was not a flight risk, where the evidence showed he had prepared to flee abroad), *aff'd*, 744 F. App'x 861 (5th Cir. 2018).

### F. The Nature and Seriousness of the Danger Posed by Omar's Release

The fourth factor is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."[237] To detain a defendant on this ground, the Government must prove by clear and convincing evidence that he "presents an identified and articulable threat to an individual or the community."[238]

The Government's danger argument as to Omar rests on the allegations of the indictment and on one call. On September 24, 2026, Omar told Amani that Iman should reach out to "Shujaie," whom Agent Crabtree identified as Saleem Alzaq, and that Amani could ask family members in Palestine to contact him.[239] The Government argues that this shows Omar "is not willing to cease communications with Hamas."[240] Omar responds, and the call log reflects, that the purpose was to obtain "the videos when Adam [Abdel] sent the money to feed the people," which Omar regards as evidence of his innocence.[241] At the hearing before this Court, the Government relied on the same call and on the nature of the charges, but it presented no additional evidence, and only argument, that Omar's release would endanger the community. Because the Court finds that no condition or combination of conditions will reasonably assure Omar's appearance as required, it need not decide whether the Government has proved by clear and convincing evidence that Omar's release would endanger the community, and it does not rely on this factor in making its determination that Omar must be detained pending trial.[242]

---

[237] 18 U.S.C. § 3142(g)(4).
[238] *Salerno*, 481 U.S. at 751; *Fuentes*, 2026 WL 1090772, at *5.
[239] R. Doc. 48-1 at 10–11, 13; R. Doc. 48-2 at 2; R. Doc. 74 at 29:24–30:12.
[240] R. Doc. 48-1 at 13.
[241] R. Doc. 68 at 6; R. Doc. 48-2 at 2.
[242] *See Rueben*, 974 F.2d at 586; *Fortna*, 769 F.2d at 249.

## G. Conditions of Release

The Magistrate Judge released Omar to the custody of Ms. Mojahed, on conditions that included surrender of his passports and travel documents, travel limited to the Eastern District of Louisiana, GPS location monitoring, and no contact with co-defendants, victims, or witnesses except in the presence of counsel, and on the further condition that Omar not apply for any passport or travel document. The Magistrate Judge also required that Omar declare all his bank accounts in the United States and abroad and consent to the search of any safe deposit box.[243] This Court has considered whether those conditions, or any other condition or combination of conditions under § 3142(c)(1)(B), would reasonably assure Omar's appearance as required. The Court concludes they would not.

This Court has also considered whether Ms. Mojahed can serve as a third-party custodian. A custodian must agree "to assume supervision and to report any violation of a release condition to the court," and must be "able reasonably to assure the judicial officer that the person will appear as required."[244] Ms. Mojahed's devotion to Omar and her willingness to leave her home in Ohio reflect well on her, and the Court does not doubt her sincerity. Her testimony, described above, does not give the Court the necessary assurance, however. She ordinarily resides in Youngstown; her most recent time with Omar's family was a visit of two or three weeks a year ago; she knows nothing about the allegations; and she does not believe Omar has done or would do anything wrong. Asked about reporting a violation, she said she was "very sure" Omar would not do anything to hurt her or his family, and asked about his communications, she said she trusted him to tell her.[245] The Court agrees with the Magistrate Judge that a custodian need not monitor every

---

[243] R. Doc. 74 at 120:22–121:5.
[244] 18 U.S.C. § 3142(c)(1)(B)(i).
[245] R. Doc. 74 at 71:1–7, 72:23–73:3; *see also id.* at 68:6–20 (Ms. Mojahed's residence and most recent visit), 70:1–15 (her lack of knowledge of the allegations and her belief that Omar has done nothing wrong).

telephone call.[246] A custodian must nonetheless be able to recognize a violation and be willing to report it. Ms. Mojahed's supervision would depend largely on what Omar chose to tell her, and nothing in the record suggests she would otherwise learn of instructions he gave to relatives abroad about money held overseas.

The Court agrees with the Magistrate Judge that the possibility that a condition can be circumvented does not, by itself, make the condition inadequate.[247] Location monitoring would alert the authorities after Omar left his residence, but it certainly would not prevent his departure.[248] The Court's concern here is narrower. The record shows funds held abroad by a relative, which no monitoring condition would reach. The conditions the Magistrate Judge imposed place no limit on Omar's use of the telephone or the internet, and no restriction on moving money abroad, directly or through others.

The Court has therefore also considered the most restrictive package available short of detention. That package would include home incarceration rather than home detention, location monitoring, a prohibition on any internet-capable device in the home, the surrender of every passport, a ban on sending or directing money abroad, a secured bond, and supervision by Ms. Mojahed while physically living in the same home as Omar. Even that package, however, would not reasonably assure Omar's appearance. Neither a ban on devices nor a ban on financial transfers would prevent relatives abroad from moving money for him. His recorded calls show him directing a relative abroad to do just that.[249] Meanwhile, a bond provides only "an illusory sense of security" when the defendant lacks any "meaningful interest in money or property within this Court's

---

[246] *Id.* at 71:23–72:14.
[247] *Id.* at 94:14–95:8.
[248] *See United States v. Nasr*, No. 24 Cr. 19 (AT), 2024 WL 3102178, at *3–4 (S.D.N.Y. June 24, 2024) (noting that "ankle monitors can be removed").
[249] R. Doc. 48-2 at 2–3; R. Doc. 74 at 23:7–16, 29:4–7, 31:4–21.

reachable powers."[250] Omar's assets in this country have been frozen or seized, while the account in Jordan and the residence there remain beyond the reach of this Court. The declaration of accounts the Magistrate Judge required depends entirely on Omar's candor. But the Court cannot ignore that soon after his arrest, Omar was recorded discussing how to keep the Jordanian account from the FBI, how to avoid naming the bank over the telephone, and how to have a relative withdraw the funds and hold them abroad. That conduct gives the Court little confidence Omar would comply with conditions that depend on his good faith.

In a case involving money sent to support a foreign terrorist group abroad, the Ninth Circuit held that a package of conditions more restrictive than those the Magistrate Judge imposed here would not reasonably assure the safety of the community. Federal Pretrial Services there proposed GPS monitoring, limits on internet use, and "a ban on the sending of money overseas without the permission of Pretrial Services." The court accepted the government's point that it "would not be possible to detect whether [the defendant] asked a family member or friend to send money," and it explained that any conditions short of a "replica detention facilit[y]" would "necessarily hinge on [the defendant's] good faith compliance."[251] Although that holding concerned danger, its reasoning applies equally to conditions meant to assure appearance.

While owing it no legal deference, the Court has given careful consideration to the Magistrate Judge's thoughtful ruling, which he described as a close call.[252] At the hearing before this Court, the Pretrial Services Office withdrew the recommendation it had made to the Magistrate Judge. The Court gives that change little weight. It rests in part on a statement the Court does not attribute to Omar, and the officer could not say whether the information about Omar's assets would

---

[250] *Good*, 2025 WL 2613628, at *8 (unsecured appearance bond).
[251] *United States v. Hir*, 517 F.3d 1081, 1092–94 & n.13 (9th Cir. 2008).
[252] R. Doc. 74 at 115:7–11.

have changed the recommendation on its own. The Magistrate Judge concluded that Omar had an incentive to flee but not the means, given the surrender of his passports and location monitoring.[253] On its own review of the record, this Court reaches a different conclusion on the question of means, for all the reasons stated above. And, this Court has, in other cases, found that the availability of more restrictive conditions appropriately answered the Government's concerns.[254] The concern here is different. No condition the Court could impose would reach funds held abroad by a relative, and Omar's recorded calls show him using that arrangement to keep the funds beyond the reach of the FBI.

### H. Findings as to Omar

Having considered the record de novo, the presumption, and the factors set out in § 3142(g), the Court makes the following written findings of fact and statement of reasons as to Omar.[255]

The Court's finding does not rest on the seriousness of the charges or on Omar's foreign ties alone. It rests on the presumption, which remains in the case, and on the combination of circumstances the record shows. Omar faces a substantial sentence, and the freezing of his accounts and the seizure of his cash, cars, and businesses have left him little property in this district to lose. He has the means to live abroad. According to the FBI's summaries of his calls from jail, he directed a relative in Jordan to withdraw up to $30,000 from his account there, $4,000 at a time, and to deposit it in the relative's own account, and within days of his arrest others brought or sent $20,000 for him. He has a destination. He holds a Jordanian passport; his wife owns an apartment in Amman; and her brother in Jordan was to hold funds withdrawn from Omar's account.

[253] *Id.* at 82:16–83:7, 88:1–6, 93:6–21, 94:10–13.
[254] *See Fuentes*, 2026 WL 1090772, at *9.
[255] *See* 18 U.S.C. § 3142(i)(1) (requiring a detention order to "include written findings of fact and a written statement of the reasons for the detention").

He has also shown the method flight would require. On these same calls, he used code words, arranged for his debit card to be carried abroad by an acquaintance, and avoided naming the bank over the telephone, and said that he did not want the FBI to lock the account, which he regarded as the only money he could hide. Conditions of release that depend on Omar's good faith would not detect such conduct, and no condition the Court could impose would reach funds held abroad by a relative. On the other side of the scale, the Court has weighed Omar's citizenship, his family and residence in this country, his lack of criminal convictions, his return to the United States after learning of the investigation, the delivery of his passports to counsel, and his willingness to accept strict conditions, including a declaration of his foreign accounts and a search of any safe deposit box.[256] The Court has given little weight to the account of Abdel's statement offered at the October 29, 2026 hearing and to the Pretrial Services Office's revised recommendation, and its finding would be the same without them. For all the reasons stated herein, the Court finds by a preponderance of the evidence that no condition or combination of conditions will reasonably assure Omar's appearance at trial as required.

## V. CONCLUSION

For the foregoing reasons, and notwithstanding that in this country "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception,"[257]

**IT IS ORDERED** that the Government's Motion to Stay Defendants' Release and to Revoke the Magistrate's Release Order[258] is **GRANTED** as to Defendant Omar Adhami.

**IT IS FURTHER ORDERED** that the Magistrate Judge's order releasing Defendant Omar Adhami on conditions[259] is **REVOKED**.

---

[256] R. Doc. 68 at 1–3; R. Doc. 74 at 34:20–35:2.
[257] *Salerno*, 481 U.S. at 755.
[258] R. Doc. 48.
[259] R. Doc. 47 at 2.

**IT IS FURTHER ORDERED** that Defendant Omar Adhami be **DETAINED** pending trial.

**IT IS FURTHER ORDERED** that Defendant Omar Adhami is committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.

**IT IS FURTHER ORDERED** that Defendant Omar Adhami must be afforded a reasonable opportunity for private consultation with counsel.

**IT IS FURTHER ORDERED** that, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which Defendant Omar Adhami is confined must deliver him to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

New Orleans, Louisiana, this 5th day of November 2026.

Darrel James Papillion

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**